# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**KOSTANDINE DHEMBI,**

      Plaintiff,

**v.**                                     **Case No. 16-CV-342**

**PATRICK CUDAHY LLC,**

      Defendant.

---

## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Kostandine Dhembi has worked as a general laborer in Patrick Cudahy LLC's Milwaukee plant for the last twenty years. Most of the time passed by without incident. During a six-month stretch in 2012, however, Ms. Dhembi had a number of run-ins with her supervisor, Gentiana Agolli. Ms. Dhembi claims that, after she injured her shoulder, Ms. Agolli repeatedly harassed her while at work. In 2016, Ms. Dhembi filed an employment-discrimination action against the company, alleging that she was discriminated against on the basis of her disability, on the basis of her age, and for using medical leave, and retaliated against for opposing such discrimination. The company has moved for summary judgment on all of Ms. Dhembi's claims.

Ms. Dhembi subsequently abandoned her medical leave and retaliation claims, leaving only her disability and age discrimination claims. Because no

reasonable jury could return a verdict in favor of Ms. Dhembi on those claims, the Court will recommend that the company's summary judgment motion be granted.

## I. Factual Background

Patrick Cudahy LLC processes, packages, and ships pork products, including bacon, at its plant outside of Milwaukee. Defendant's Separate Statement of Undisputed Material Facts ¶ 2, ECF No. 19. Phil Maher, the Senior Manager of Human Resources at that location, is responsible for overseeing all labor relations and human resources functions. Hourly employees at the plant are represented by United Food and Commercial Workers, Local 1473. Def.'s Facts ¶ 10. Pursuant to the collective bargaining agreement between the company and the union, hourly employees are guaranteed 36 hours of work per week. Def.'s Facts ¶ 11.

In October 1997, Kostandine Dhembi began working at the plant as a general laborer. Def.'s Facts ¶ 3. For most of her tenure, Ms. Dhembi was assigned to the second shift (5:00 p.m. to 3:00 a.m.) in the Microwave Division, where workers slice raw slabs of pork, cook the slices in microwaves, and package the cooked slices to customer satisfaction. Def.'s Facts ¶¶ 4–5. General laborer tasks in the Microwave Division include cutting and slicing pork slabs, carrying pieces of meat to different parts of the line, roasting the meat, processing the meat through microwaves and controlling the microwave temperature, preparing bacon slices according to customer specifications, and maintaining the cleanliness of the department. Def.'s Facts ¶ 5.

In late 2010, Ms. Dhembi was transferred to the first shift (7:00 a.m. to 5:00 p.m.). Def.'s Facts ¶¶ 6, 12. The first-shift supervisors were Rob Fons, Superintendent of the Microwave Division; Gentiana Agolli; and Luan Ademaji. *See* Def.'s Facts ¶¶ 7–9, 13; Plaintiff's Proposed Findings of Fact ¶ 4, ECF No. 24. Ms. Agolli was the lead supervisor on the first shift. Def.'s Facts ¶ 8. On several occasions, hourly workers complained to human resources about Ms. Agolli's management style. *See* Def.'s ¶¶ 14–16. Mr. Maher has coached Ms. Agolli about softening her tone. Def.'s Facts ¶ 15. According to Ms. Dhembi, a lot of people hate Ms. Agolli because she is rude and she screams a lot. Def.'s Facts ¶ 16.

Ms. Dhembi, 56 years old at the time, believed that she was one of the oldest workers in the Microwave Division. Pl.'s Facts ¶ 3; Def.'s Facts ¶ 18. However, in 2012, the ages of the Division's 147 employees ranged from 18 to 64. Def.'s Facts ¶¶ 6, 18. Seventy-five employees were age 50 and above, 39 were age 55 and above, and 31 were older than Ms. Dhembi. Def.'s Facts ¶¶ 18, 69. Ms. Dhembi did not know the age of everyone in the department, only her friends. Def.'s Facts ¶ 68.

## A. Ms. Dhembi's shoulder injury

In November 2011, Ms. Dhembi began experiencing shoulder problems. Pl.'s Facts ¶ 1. The on-staff nurse at the plant gave her ointment and over-the-counter pain medication. Pl.'s Facts ¶ 5. On January 20, 2012, Ms. Dhembi received a note from her doctor restricting her to no repetitive movements or lifting with her left shoulder for two weeks. Pl.'s Facts ¶ 7. She was sent home because no work was available with her restrictions and, according to the company, the injury was not

work-related. Ms. Dhembi claims that when she returned to work on January 23, the company refused to honor her restrictions. Pl.'s Facts ¶ 6. A few days later, she filed a worker's compensation report, alleging that she injured her shoulder at work on January 5. Pl.'s Facts ¶ 8.

Ms. Dhembi was off work for two weeks in February 2012 to care for her shoulder. Pl.'s Facts ¶¶ 9–10. Upon returning to work, Ms. Dhembi was instructed by her doctor to refrain from lifting more than five pounds and to limit repetitive activities to her left arm for three weeks. Pl.'s Facts ¶ 11. According to Ms. Dhembi, the company still refused to honor these restrictions and assigned her to her regular duties through March 2. Pl.'s Facts ¶ 12.

When Ms. Dhembi complained of shoulder pain at work on March 1, 2012, Ms. Agolli sent her to see the on-staff nurse. Def.'s Facts ¶ 19. After being examined by a doctor who treats work-related injuries at the plant, Ms. Dhembi returned to work on the line. Def.'s Facts ¶¶ 19–20. The doctor observed Ms. Dhembi working and determined that her injury was not work-related. Def.'s Facts ¶ 20; Pl.'s Facts ¶ 13. According to Ms. Dhembi, after the doctor left, Ms. Agolli called her into her office, yelled at her, and accused her of lying about injuring her shoulder at work. Pl.'s Facts ¶ 14. Ms. Agolli denies making these statements. Def.'s Facts ¶ 21.

On two or three occasions, the company's nurses also told Ms. Dhembi that her injuries were not work-related. Pl.'s Facts ¶ 2. They claimed instead that her injuries were due to her age. Nevertheless, the company ultimately agreed that Ms.

4

Dhembi's injuries were work-related and it gave her light-duty assignments. Def.'s Facts ¶ 80.

### B. Platform incident

On March 2, 2012, Ms. Dhembi was working as a grader, checking the bacon as it came down the line and removing any pieces that were not properly cooked. *See* Def.'s Facts ¶¶ 22–32. The work area for graders is high off the ground, so they use small platforms to avoid injuries caused by straining to reach product on the line. Ms. Agolli believed that Ms. Dhembi's platform was not at the proper height, so she ordered her to raise it. Def.'s Facts ¶¶ 23–24; Pl.'s Facts ¶ 15. Ms. Dhembi responded that the platform was at the correct height, and she refused to raise it. According to Ms. Agolli, Ms. Dhembi became "incensed" when she was told to adjust the platform, and she yelled at Ms. Agolli in Albanian. Def.'s Facts ¶ 27. Ms. Dhembi admits that she did not raise her stand as instructed, but she denies yelling at Ms. Agolli. *See* Plaintiff's Responses to Defendant's Proposed Findings of Fact ¶ 27, ECF No. 23. Ms. Agolli summoned Ms. Dhembi to her office to discuss the platform incident. Def.'s Facts ¶ 28; Pl.'s Facts ¶ 16. Ms. Dhembi, however, did not comply, and she went to see Mr. Fons instead.

Mr. Fons had Ms. Dhembi wait in the cafeteria while he investigated the incident. Pl.'s Facts ¶ 17; Def.'s Facts ¶ 29. Ms. Dhembi then explained herself to human resources. Mr. Maher concluded that the incident warranted discipline. Def.'s Facts ¶¶ 22, 30; Pl.'s Facts ¶¶ 18–20. He gave Ms. Dhembi a verbal warning

5

for failing to properly adjust her platform and a written warning for her interaction with Ms. Agolli.

Though Ms. Dhembi believes the company disciplined her in attempt to fire her or to induce her to quit, Pl.'s Facts ¶ 20, she acknowledges that neither disciplinary action had any effect on her compensation or job duties, both of which are controlled by the CBA, Def.'s Facts ¶ 31. The union did file a grievance related to this incident on behalf of Ms. Dhembi; ultimately, the grievance was resolved in the company's favor. Def.'s Facts ¶ 32.

A few days after the platform incident, Ms. Agolli crossed paths with Ms. Dhembi's sister, Vasilika Proko, in the women's restroom. Pl.'s Facts ¶ 21. Ms. Agolli confronted Ms. Proko and said, "[W]hat are you and your sister trying to do to me, get me fired? I'm young and I can find another job, but what is your sister going to do that she's old and doesn't speak English?" *Id.* Ms. Agolli and Ms. Proko argued back and forth until Ms. Dhembi walked out of one of the stalls, having overheard their conversation.

### C. Wall-scrubbing incident

On March 16, 2012, Ms. Dhembi's doctor determined that her shoulder strain had resolved and that she could return to full duty. Pl.'s Facts ¶ 22. Three weeks later, on April 5, Mr. Ademaji assigned Ms. Dhembi and another employee, Rebecca, to scrub the walls in the machine room. Def.'s Facts ¶ 33; Pl.'s Facts ¶ 27. Scrubbing the machine room's walls is part of the regular duties of a general laborer. Def.'s Facts ¶ 36. Ms. Dhembi complained that the task hurt her shoulder, so she asked

Mr. Ademaji to switch with another employee. Pl.'s Facts ¶ 27. According to Ms. Dhembi, Mr. Ademaji told her to use her other shoulder, and Ms. Agolli laughed. Mr. Ademaji then switched Rebecca out but made Ms. Dhembi continue scrubbing the walls while he, Ms. Agolli, and Mr. Fons looked on and laughed at her. Ms. Dhembi claims that she complained to the nurse and the union about Mr. Ademaji's treatment, but the union did not support her. Pl.'s Facts ¶ 28; Def.'s Facts ¶ 34.

### D. Meat-carrying incident

On April 12, 2012, Ms. Dhembi was assigned to load chunks of pork belly, which came down the line, into a plastic bucket and take them to a chute. Def.'s Facts ¶ 37; Pl.'s Facts ¶ 29. To reach the chute, she had to climb five steps. In Ms. Dhembi's estimation, a filled bucket weighed as much as 18 pounds—3 to 4 pounds per slice of meat plus a 4-pound bucket. Def.'s Facts ¶ 38; Pl's Facts ¶ 29. Ms. Dhembi became tired, her knees got weak, and her shoulder pain worsened when carrying a filled bucket up the steps, so she loaded the bucket with only a few slices of meat at a time.

Ms. Agolli noticed and asked Rob Janko, the crew lead that morning, why Ms. Dhembi was not filling the bucket. Def.'s Facts ¶ 39; Pl.'s Facts ¶¶ 30–32. When told by Mr. Janko to carry more meat on each trip, Ms. Dhembi responded that her shoulder hurt. She also complained to Mr. Janko that she was supposed to be rotated from this task after thirty minutes but that she had been doing it for over an hour. Ms. Agolli then sent Ms. Dhembi to see the nurse. The nurse instructed Ms. Dhembi to carry only 15 pounds at a time. Def.'s Facts ¶ 40.

7

When Ms. Dhembi returned from the nurse's office, Ms. Agolli and Mr. Fons met with her to see how much she had been carrying. Def.'s Facts ¶ 41. Each slice of meat weighed 1 to 2 pounds, but Ms. Dhembi insists that the larger slices she had been carrying were cut into smaller chunks. Def.'s Facts ¶¶ 41–42; Pl.'s Facts ¶ 33. The empty bucket weighed 4 pounds. Ms. Dhembi claims that she was given a smaller bucket and instructed to continue carrying the meat. After Ms. Agolli and Mr. Fons left, Mr. Janko rotated Ms. Dhembi out of this task. Pl.'s Facts ¶ 34. Ten minutes later, however, Ms. Agolli screamed at Ms. Dhembi to return to the meat-carrying task. A safety manager later told Ms. Dhembi that, to be on the safe side, she should carry no more than 10 pounds. Def.'s Facts ¶¶ 43–44; Pl.'s Facts ¶ 34. Ms. Dhembi continued working with this restriction for the rest of the morning.

According to Ms. Dhembi, the meat-carrying incident caused her a lot of stress and swelling in her leg. Pl.'s Facts ¶ 35; Def.'s Facts ¶ 45. She filed injury reports with the company and the Occupational Safety and Health Administration. Pl.'s Facts ¶¶ 37–38. Ms. Dhembi also saw her doctor, and he provided her a note indicating that, given her shoulder and leg problem, she should stay home for two weeks. On April 19, 2012, Ms. Dhembi was examined by the company's doctor. Pl.'s Facts ¶¶ 39–40. He assessed left trapezius sprain or strain and left ankle swelling and restricted Ms. Dhembi to mainly sitting and right-handed work, with left hand assist. The doctor indicated that Ms. Dhembi could return to work but that she had to perform sedentary work for three weeks. Ms. Dhembi's shoulder restriction remained in place until July 16, 2012. *See* Pl.'s Facts ¶¶ 43, 47–49, 52–53, 61.

8

### E. Seated-work incident

Ms. Dhembi claims that, on April 23, 2012, Ms. Agolli assigned her to a standing task despite her restrictions. Pl.'s Facts ¶ 41; Def.'s Facts ¶ 48. She complained to the crew leader and, after Ms. Agolli received confirmation from the nurse, Ms. Dhembi was assigned to label boxes—a task that could be accomplished sitting down. Pl.'s Facts ¶ 41; Def.'s Facts ¶ 49. According to Ms. Dhembi, Ms. Agolli made her life miserable while she was on light duty by yelling at her and giving her dirty looks. Pl.'s Facts ¶ 44. Ms. Dhembi complained about Ms. Agolli's behavior to the company's nurses. Pl.'s Facts ¶ 45.

### F. Bacon-packaging incident

After a customer complained about being shorted bacon in some packages, on June 28, 2012, Mr. Fons audited the work on the company's line. Def.'s Facts ¶¶ 50–51. According to Mr. Fons, he observed Ms. Dhembi packaging bacon and, upon inspection, discovered that several of her sheets were short one slice. Def.'s Facts ¶ 52. When confronted by Mr. Fons, Ms. Dhembi insisted the mistake was the fault of another employee; she had not packaged the materials Mr. Fons inspected. Def.'s Facts ¶ 53; Pl.'s Facts ¶ 54. Mr. Fons was concerned that Ms. Dhembi had denied responsibility, so he gave her performance counseling on good workmanship and taking ownership of mistakes. Def.'s Facts ¶ 54. Ms. Dhembi was also given a written disciplinary notice for "poor workmanship." Pl.'s Facts ¶ 56.

The following day, Mr. Fons and Mr. Maher met with Ms. Dhembi, who has very upset about the incident, to assure her that the intent was not to single her out and that the counseling would not affect her work status. Def.'s Facts ¶ 57. At least

9

five other employees received counseling from Mr. Fons for making similar mistakes that day. Def.'s Facts ¶ 55. And the counseling did not affect Ms. Dhembi's job duties, compensation, or work status and was not considered part of the progressive discipline system that might lead to suspension or termination. Def.'s Facts ¶ 56.

## G. Early-dismissal incidents

Workers in the Microwave Division are sometimes sent home early if, for example, one of the lines shuts down and there is not enough work to keep everyone busy. *See* Def.'s Facts ¶ 67. According to Ms. Dhembi, after her injury, Ms. Agolli sometimes sent her home first, before younger employees with less seniority. Pl.'s Facts ¶¶ 23–24. The younger employees included Ms. Proko, Fatmira Aboskovsik, and Emanuela. Def.'s Facts ¶ 67. For instance, on April 5, 2012, Ms. Dhembi was sent home early while younger employees, including Ms. Proko, remained working. Pl.'s Facts ¶ 25. On a different occasion, however, Ms. Agolli sent both Ms. Dhembi and Ms. Proko home early when their lines shut down thirty minutes before others. Pl.'s Facts ¶ 26. Ms. Agolli watched the sisters to ensure they clocked out early.

## H. Ms. Dhembi's return to the second shift

Shortly after the packaging incident, on July 2, 2012, the company allowed Ms. Dhembi to return to the second shift. Pl.'s Facts ¶ 59. Since then, Ms. Dhembi has reported to Jose Martinez, and there have been no clashes between the two; Ms. Dhembi describes Mr. Martinez as supportive of her. Def.'s Facts ¶ 58. According to Ms. Dhembi, she was not returned to her regular second-shift job until December

21, 2012, when she became a Cook Controller in the Microwave Division. Pl.'s Facts ¶ 67.

## I. Ruler incident

Despite moving to the second shift, Ms. Dhembi clashed again with Ms. Agolli in November 2013. Ms. Dhembi was measuring bacon with a metal ruler while also controlling the temperature of the microwave. Def.'s Facts ¶ 59; Pl.'s Facts ¶ 72. During the shift change, Ms. Agolli saw Ms. Dhembi touch the microwave control panel with the ruler. Ms. Agolli told Ms. Dhembi to use her fingers, not the ruler; Ms. Dhembi denied touching the panel with the ruler. The two women than argued loudly over the incident. Def.'s Facts ¶ 60. But no discipline was issued. Def.'s Facts ¶ 62.

## J. Grievance and administrative charge

In two separate matters, the union grieved the discipline Ms. Dhembi received following the platform incident and the meat-carrying incident. Def.'s Facts ¶ 63. The union alleged that Ms. Agolli's treatment of Ms. Dhembi was unfair and abusive. It did not, however, allege that Ms. Dhembi was discriminated against on the basis of age, disability, use of medical leave, or any other protected category. Def.'s Facts ¶ 64. The grievance hearing was conducted over two sessions in April and June of 2012. Def.'s Facts ¶ 65. Ultimately, the grievance was denied because witnesses did not corroborate Ms. Dhembi's version of events. Ms. Dhembi became so upset after the June hearing that she was hospitalized for stroke-like symptoms. Pl.'s Facts ¶ 50.

11

On July 25, 2012, Ms. Dhembi filed a charge with Wisconsin's Equal Rights Division, alleging discrimination based on age and disability. *See* Exhibit 1 to Defendant's Memorandum, ECF No. 18-2. Ms. Dhembi alleged that after suffering a work-related injury, she was harassed, not rotated like other employees, required to carry 15 pounds of meat up stairs, disciplined, and sent home prior to reaching 40 hours in favor of less senior employees. *Id.* at 3. According to Ms. Dhembi, the alleged discrimination took place from March 1, 2012, through May 21, 2012. After investigation, the United States Equal Employment Opportunity Commission was unable to conclude that Ms. Dhembi's rights had been violated. *Id.* at 4. The EEOC issued Ms. Dhembi a right-to-sue letter on December 22, 2015. Ms. Dhembi remains employed by the company. *See* Def.'s Facts ¶¶ 17, 58.

## II.     Procedural Background

On March 21, 2016, Ms. Dhembi sued Patrick Cudahy LLC in federal court, alleging that the company discriminated against her on the basis of her disability, on the basis of her age, and for using medical leave, and retaliated against her for opposing disability and age discrimination. *See* Complaint, ECF No. 1. On June 28, 2017, the company moved for summary judgment on all of Ms. Dhembi's claims. *See* Defendant's Motion for Summary Judgment, ECF No. 18; Defendant's Memorandum in Support, ECF No. 18-1. Ms. Dhembi filed a brief in opposition to the Motion on September 1, 2017. *See* Plaintiff's Brief in Opposition, ECF No. 27. In her response, Ms. Dhembi abandoned her medical leave and retaliation claims. Pl.'s

Br. 1. The company filed its reply brief on October 16, 2017. *See* Defendant's Reply, ECF No. 29.

The matter is assigned to United States District Judge Lynn Adelman. On June 19, 2018, Judge Adelman referred the company's summary judgment motion to this Court pursuant to 28 U.S.C. § 636(b)(1)(B) for a report and recommendation. *See* Order, ECF No. 32. No trial date has been set.

## III.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* (internal quotation marks omitted).

13

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in [his] favor." *Fitzgerald*, 707 F.3d at 730 (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)).

## IV. Discussion

The company argues that it is entitled to summary judgment on Ms. Dhembi's remaining disability and age discrimination claims.

### A. ADA claims

The Americans with Disabilities Act makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "A 'qualified individual' with a disability is a person who, 'with or without reasonable accommodation, can perform the essential functions of the employment position.'" *Severson v. Heartland Woodcraft, Inc.*, 872

14

F.3d 476, 479 (7th Cir. 2017) (quoting 42 U.S.C. § 12111(8)). The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)–(C).

Ms. Dhembi alleges that her shoulder and ankle problems render her disabled within the meaning of the ADA. According to Ms. Dhembi, these impairments affected her ability to care for herself, perform manual tasks, walk, stand, and lift. Pl.'s Br. 3. She claims that the company failed to accommodate her disability, Pl.'s Br. 10–16, and discriminated against her for having a disability, Pl.'s Br. 16–26.

### 1. Failure to accommodate

"In order to establish a claim for failure to accommodate, a plaintiff must show that: (1) [she] is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Bunn* v. *Khoury Enters.*, 753 F.3d 676, 682 (7th Cir. 2014) (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)).

Assuming Ms. Dhembi has presented sufficient evidence to satisfy the first two elements of a prima facie case, no reasonable jury could find that the company failed to reasonably accommodate her disability. Ms. Dhembi first complained about her shoulder hurting in November 2011. She was treated by the company's on-site nurse, and eventually her own doctor restricted her from performing repetitive movement and lifting with her left shoulder. On January 20, 2012, Ms. Dhembi was

15

sent home early because there was no work available with her restrictions, but she admits that she worked the minimum number of weekly hours guaranteed in the CBA. *See* Pl.'s Resp. to Def.'s Facts ¶ 71. The company approved Ms. Dhembi's injury-related time off in January and February 2012.

Ms. Dhembi has not provided sufficient evidence from which a reasonable jury could conclude that the company failed to honor her restrictions after she returned to work on January 23, 2012. For one, these incidents allegedly occurred prior to the dates of discrimination Ms. Dhembi described in her administrative charge. *See* Def.'s Mem., Ex. 1 at 3. Moreover, Ms. Dhembi's allegations, *see* Pl.'s Facts ¶¶ 6, 12, are conclusory and devoid of any details that would enable a jury to find a failure to accommodate disability. Ms. Dhembi indicates that she was assigned "regular duties," but she does not describe what tasks she was required to perform or how those tasks exceeded her restrictions. The evidence submitted in support of her proposed facts—correspondence Ms. Dhembi submitted to the Wisconsin Equal Rights Division, *see* Exhibit 2 to Declaration of Kostandine Dhembi, ECF No. 26-2—does not fill in any of these key details. The unsworn statement is also inadmissible hearsay, *see* Fed. R. Evid. 802, and thus cannot be considered according to Fed. R. Civ. P. 56(c)(2).

Ms. Dhembi also claims that the company failed to accommodate her disability on several occasions in April 2012. *See* Pl.'s Br. 12–15. She admits, however, that she was not subject to any work restrictions on those days. *See* Pl.'s Resp. to Def.'s Facts ¶¶ 35, 45. Despite having no restrictions, the company did

ultimately limit the weight Ms. Dhembi could carry on April 12 to 10 pounds. Likewise, when Ms. Agolli received confirmation of Ms. Dhembi's sedentary restriction on April 23, she reassigned her to a task that could be accomplished sitting down. The undisputed facts therefore show that, when the company became aware of a limitation, it either modified Ms. Dhembi's duties or reassigned her to a task that could be performed notwithstanding her limitations. That is "exactly the kind of accommodation envisioned by the regulations applicable to the ADA." *Bunn*, 753 F.3d at 683.

Finally, Ms. Dhembi claims that the company "refused to engage in the interactive process under the ADA in order to accommodate [her] disabilities." Pl.'s Br. 11. The Seventh Circuit, however, has determined that "there is no separate cause of action for a failure of that interactive process." *Bunn*, 753 F.3d at 683. Accordingly, no reasonable jury could find that the company failed to reasonably accommodate any alleged disability Ms. Dhembi had.

### 2. Disparate treatment

In *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit shifted away from the traditional direct/indirect methods of analyzing employment-discrimination cases. Subsequent to *Ortiz*, the appropriate inquiry in an ADA case is whether, when considering the evidence as a whole, a reasonable factfinder could conclude that the employee's disability caused the adverse employment action. *See Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017).

17

Ms. Dhembi alleges that the company discriminated against her on the basis of her disabilities. According to Ms. Dhembi, after she injured her shoulder in November 2011, the company began harassing her and treating her in a hostile manner. She further alleges that she suffered several adverse employment actions because of her disability.

### a. Hostile work environment

The Seventh Circuit "has not recognized explicitly an ADA claim based on hostile environment or harassment." *Silk v. City of Chicago*, 194 F.3d 788, 803 (7th Cir. 1999) (citing *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1017 (7th Cir. 1996)). However, in affirming summary judgment in favor of employers, the court has assumed that such a claim is cognizable under the ADA. *See id.*; *see also Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009). This Court will follow suit.

To prevail on a hostile work environment claim, "a plaintiff must show that . . . her work environment was both subjectively and objectively hostile. . . . An objectively hostile environment is one that a reasonable person would find hostile or abusive." *Silk*, 194 F.3d at 804 (quoting *Adusumilli c. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998)). In determining whether a work environment is objectively hostile, "courts must consider all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

18

Ms. Dhembi has not provided sufficient evidence from which a reasonable jury could find that the company subjected her to a hostile work environment under the ADA. Ms. Dhembi describes a number of work incidents that transpired during the first half of 2012 but little evidence linking this alleged harassment to her disability. Rather, the evidence she relies upon shows that the company initially questioned whether her injuries were work-related and that a personal conflict existed between her and her supervisor, Ms. Agolli. Ms. Dhembi, however, admits that the company ultimately agreed that her injuries were work-related and gave her light-duty assignments. *See* Pl.'s Resp. to Def.'s Facts ¶ 80. As such, no reasonable trier of fact could conclude that Ms. Agolli's alleged yelling, whether considered in isolation or together, was so severe and pervasive as to alter the conditions of Ms. Dhembi's employment. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Silk*, 194 F.3d at 807 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Of the incidents described by Ms. Dhembi, only two involved references to her alleged disability: on March 1, 2012, when Ms. Agolli allegedly accused her of lying about her injury being work-related; and on April 5, 2012, when Mr. Ademaji, Ms. Agolli, and Mr. Fons allegedly laughed at her while she scrubbed walls. No reasonable jury, however, could find that these incidents—while objectionable— were frequent or serious enough to be considered a hostile workplace environment. *See Silk*, 194 F.3d at 807.

19

### b. Adverse employment action

"An adverse employment action is broadly defined as a 'materially adverse change in the terms and conditions of employment.'" *Hopkins v. Godfather's Pizza, Inc.*, 141 F. App'x 473, 476 (7th Cir. 2005) (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1044 (7th Cir. 2002)).

Ms. Dhembi acknowledges that she remains employed by the company and that Ms. Agolli stopped supervising her in July 2012. *See* Pl.'s Br. 16–26. She nevertheless alleges that the company subjected her to three types of adverse employment action: (1) the company caused her additional physical injury, pain, and discomfort when it forced her to perform job duties against her medical restrictions; (2) the company punished her for requesting accommodation of her disability by administering unwarranted disciplinary notices; and (3) the company sent her home early and refused to return her to her regular job on the second shift.

No reasonable jury could find that Ms. Dhembi suffered an adverse employment decision because of her disability. Ms. Dhembi offers no support for her contention that pushing an employee beyond her injury-related work restrictions amounts to adverse action for purposes of a disparate-treatment claim. And the Court already has determined that no reasonable juror could find that the company failed to accommodate her alleged disability. In other words, Ms. Dhembi has provided no evidence that the additional physical injury, pain, and discomfort she allegedly endured materially altered the terms and conditions of her employment.

Similarly, Ms. Dhembi admits that the disciplinary action she received, whether warranted or not, did not materially alter the terms and conditions of her employment. The warnings stemming from the platform incident and the counseling following the bacon-packaging incident did not affect Ms. Dhembi's job duties, compensation, or work status. *See* Pl.'s Resp. to Def.'s Facts ¶¶ 31, 56[1].  The counseling also was not considered part of the company's progressive discipline system. And the November 2013 ruler incident did not result in any discipline. *See id.* ¶ 62.

Finally, Ms. Dhembi has not provided any admissible evidence linking her claims of lost wages to her alleged disability. Ms. Dhembi alleges that, on a few occasions after she injured her shoulder, she was sent home early "before the younger workers with less seniority." Pl.'s Br. 24–25. She does not cite her disability as a motivating factor for the company's decision or point to any similarly situated, non-disabled employee who was treated more favorably than she was. She also agrees that she always worked the minimum number of weekly hours guaranteed under the CBA. *See* Pl.'s Resp. to Def.'s Facts ¶ 71. Thus, the wages she missed out on when she was sent home early did not materially affect her compensation. Ms. Dhembi has similarly failed to provide admissible evidence from which a juror could infer that the company prevented her from returning to the second shift at a higher rate of pay because of her disability.

---

[1] Ms. Dhembi did not cite any admissible evidence to support her denial of this proposed fact.

### B.  ADEA claim

The Age Discrimination in Employment Act of 1967 makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 180 (2009); *see also Lauth v. Covance, Inc.*, 863 F.3d 708, 715 (7th Cir. 2017). "In other words, 'in the ADEA context, it's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for [her] age, the adverse action would not have occurred." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018) (quoting *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009)).

"[At] the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* her age." *Carson v. Lake Cty.*, 865 F.3d 526, 533 (7th Cir. 2017) (citing *Ortiz*, 834 F.3d at 765). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136

(7th Cir. 1993) (citations omitted). "[A] mere inconvenience or an alteration of job responsibilities" is not actionable. *Crady*, 993 F.3d at 136.

Ms. Dhembi believed that she was one of the oldest workers in the company's Microwave Division and that she had the most seniority. She alleges that the company discriminated against her because of her age when it sent her home earlier than younger employees when there was not enough work. She further alleges that she suffered adverse employment actions because of her age. According to Ms. Dhembi, the company's discriminatory animus can also be inferred from comments others made about her age. *See* Pl.'s Br. 27–29.

Considering the evidence as a whole, the Court finds that no reasonable jury could conclude that Ms. Dhembi's age was the motivating factor for any adverse employment action she allegedly suffered. The undisputed facts show that Ms. Dhembi was not the oldest employee in her department, that over 50% of the employees in her department were 50 or older, and that more than 20% of the employees were older than her (age 56) at that time. *See* Pl.'s Resp. to Def.'s Facts ¶¶ 18, 69. Moreover, Ms. Dhembi admits that, besides her friends, she did not know the ages of any other employees in her department. *See* Pl.'s Resp. to Def.'s Facts ¶ 68.

Ms. Dhembi's allegation about being sent home early in favor of younger employees lacks sufficient detail from which a jury could infer age discrimination. During her deposition, Ms. Dhembi listed three younger individuals who allegedly stayed at work while she was sent home: Vasilika Proko, Fatmira Aboskovsik, and

Emanuela. *See* Exhibit 64 to Dhembi Decl., ECF No. 26-64 at 24. But Ms. Dhembi has not provided any evidence that these women were similarly situated to her in their skills, duties, or qualifications. *See Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (noting that "[a] similarly-situated employee is one whose performance, qualifications, and conduct are comparable in all material respects"). Also, on one of the occasions Ms. Dhembi was allegedly sent home early, so was her younger sister, Ms. Proko. *See* Pl.'s Facts ¶ 26. Ms. Dhembi provides no detail about who was sent home and who remained working on the other occasions. She does, however, admit that employees were sometimes sent home early if work ran out before the end of the shift and that she was not the only employee sent home. *See* Pl.'s Resp. to Def.'s Facts ¶ 67.

Ms. Dhembi has not provided any admissible evidence linking the other adverse actions, *see* Pl.'s Br. 27, to her age. Rather, the undisputed facts demonstrate that these actions did not materially alter the terms and conditions of her employment. *See* supra section **IV.A.2.b.**

Finally, no reasonable jury could infer a discriminatory motive based on comments referencing Ms. Dhembi's age. Ms. Dhembi points to only two such incidents. She claims that, in March 2012, Ms. Agolli told Ms. Proko that Ms. Dhembi would have difficulty finding another job because she is old and does not speak English. *See* Pl.'s Facts ¶ 21. She also claims that, when she complained about her injuries in 2012, the company's nurses told her two or three times that they work age-related, not work-related. *See* Pl.'s Facts ¶ 2. These comments,

however, did not relate to any allegedly adverse employment action. *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). "[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Id.* (quoting *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006)).

## V.      Conclusion

For all the foregoing reasons, the finds that no reasonable jury could return a verdict in favor of Ms. Dhembi on any of her claims. The Court will therefore recommend that Judge Adelman grant the company's summary judgment motion.

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that Defendant's Motion for Summary Judgment, ECF No. 18, be **GRANTED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Civ. P. 72(b)(2), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any recommendation herein, or part thereof, may be filed within fourteen days of service of this Recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of your right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin, this 6th day of August, 2018.

BY THE COURT:

s/ David E. Jones
DAVID E. JONES
United States Magistrate Judge
