# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**KOSTANDINE DHEMBI,**
        **Plaintiff,**

    **v.**                          **Case No. 16-C-0342**

**PATRICK CUDAHY LLC,**
        **Defendant.**

---

## DECISION AND ORDER

Kostandine Dhembi alleges that her employer, Patrick Cudahy LLC, discriminated against her on the basis of age and disability and also failed to reasonably accommodate her disability, in violation of the Age Discrimination in Employment Act and the Americans with Disabilities Act. After Patrick Cudahy moved for summary judgment, I referred the motion to Magistrate Judge David E. Jones for a report and recommendation. Magistrate Judge Jones recommended that Patrick Cudahy's motion be granted. The plaintiff has filed objections to the recommendation, which I address in this order.

## I. BACKGROUND

Patrick Cudahy LLC processes, packages, and ships pork products, including bacon, at a plant located near Milwaukee. The plaintiff, who is Albanian and speaks limited English, began working at the plant as a general laborer in October 1997. For most of her tenure at the company, the plaintiff worked second shift in the plant's Microwave Division, where workers slice raw slabs of pork, cook the slices in microwaves, and package the cooked slices. General laborer tasks in this division include cutting and slicing pork slabs, carrying pieces of meat to different parts of the

line, controlling the microwaves that are used to cook the meat, preparing bacon slices according to customer specifications, and maintaining the cleanliness of the department.

In December 2010, when plaintiff was 56 years old, she was transferred from second shift to first shift. The plaintiff remained on first shift for approximately eighteen months before being transferred back to second shift. The lead supervisor on first shift was Gentiana Agolli, who is also Albanian. The parties agree that Agolli had an abrasive management style. According to the plaintiff, Agolli "is well known for bad manners, yelling and screaming at employees." (Dhembi Decl. Ex. 2 at p. 2.[1]) Patrick Cudahy was aware of Agolli's reputation, and it gave her "training to improve her attitude and communication skills with employees." (*Id.*) Despite this training, the plaintiff and Agolli clashed frequently during the plaintiff's time on second shift, as discussed in more detail below.

In November 2011, the plaintiff began experiencing shoulder pain. She went to the on-site nurse at the plant, who gave her ointment and over-the-counter pain medication, but the pain continued. On January 20, 2012, the plaintiff saw her own physician, who examined her shoulder and restricted her to no repetitive movements or lifting with her left shoulder for two weeks. That same day, the plaintiff presented her doctor's restrictions to Patrick Cudahy. According to the plaintiff, when she went to

---

[1] Exhibit 2 to the plaintiff's declaration is a statement she submitted to Wisconsin's Equal Rights Division during the administrative phase of this case. Although the statement on its own would be hearsay, the plaintiff in her declaration swears under penalty of perjury that the statement is true. (Dhembi Decl. ¶ 3.) Accordingly, I treat the facts stated in the statement as though they had been included in the plaintiff's declaration and will consider them in opposition to the motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A).

work on Monday, January 23, she worked a full day on regular duty. (Dhembi Decl. Ex. 2 at p. 1.) She also claims that she worked three hours the next day without accommodation of her restrictions and then was sent home. (*Id.*) On January 25, 2012, the plaintiff filed a worker's compensation report alleging that she suffered a shoulder injury while working on the production line on January 5, 2012.

In February 2012, the plaintiff presented Patrick Cudahy with another note from her doctor. This note stated that she must be off work completely for two weeks because of her shoulder pain. Patrick Cudahy excused the plaintiff from work for this time. Moreover, it paid her sick pay for her injury-related absences in January and February 2012. (Pl.'s Proposed Findings of Fact ("PFOF") ¶ 10.)

At the end of February, the plaintiff's doctor cleared her to return to work, provided that, for three weeks, she not lift more than five pounds and that she limit repetitive activities involving her left arm. According to the plaintiff, Patrick Cudahy assigned her to her regular duties until March 2, 2012. (Dhembi Decl. Ex. 2 at p. 1.)

On March 1, 2012, Patrick Cudahy's doctor observed the plaintiff working on the line in order to assess whether her shoulder injury was work-related. The doctor concluded that it was not work-related.[2] According to the plaintiff, after the doctor left, Agolli called her into her office and began yelling at her and accusing her of lying about her injury's being work-related. Agolli demanded that the plaintiff "tell [the] truth" about what she did to her shoulder. (Dhembi Decl. Ex. 2 at p. 2.) Agolli also threatened to

---

[2] I note that whether the injury was work-related has no bearing on whether the plaintiff was disabled within the meaning of the ADA. Whether the injury was work-related may bear upon the plaintiff's worker's compensation claim, but that claim is not part of this suit.

assign the plaintiff to the bacon-slicing department to "see what real work feels like." (*Id.*)  The plaintiff left Agolli's office in tears.

On March 2, 2012, the plaintiff was working as a grader, checking the bacon as it came down the line and removing any pieces that were not properly cooked.  The work area for graders is elevated, and the workers stand on platforms to avoid injuries caused by straining to reach pieces of bacon.  Agolli observed the plaintiff, determined that her platform was too low, and instructed her to raise it.  When the plaintiff told Agolli that she was comfortable with the stand at its current height, Agolli ordered her to raise it further.  (I note that the plaintiff does not contend that she needed to keep the platform lowered to accommodate her shoulder injury.)  The plaintiff contends that she then told Agolli that she would ask the janitor to raise her platform when he came by.  But according to the defendant, the plaintiff instead started yelling at Agolli in Albanian and disrupting work on the line.  At this point, Agolli ordered the plaintiff into her office and told her she would write her a warning for not raising the platform when ordered to do so.  The plaintiff refused to go to Agolli's office but instead went to the office of another supervisor, Rob Fons.  According to the plaintiff, Agolli replied, "I don't care, no matter where you go you not going to accomplish anything other than be able to shave my [pussy]."  (Dhembi Decl. Ex. 2 at pp. 2–3.)  The plaintiff headed to Fons's office in tears, and Agolli followed while yelling "I will suspend you if you don't come in my office."  (*Id.* at 3.)

Fons told the plaintiff to wait in the cafeteria.  He then asked her to accompany him to human resources and speak to Phil Maher, the manager of human resources. Maher investigated the incident and concluded that the plaintiff should be disciplined.

He gave her a verbal warning for failing to properly adjust her platform height and a written warning for her interaction with Agolli.

A few days after this incident, the plaintiff's sister, Vailika Proko, who also works at Patrick Cudahy, was in the bathroom at work, when Agolli came in. Agolli asked Proko whether her and her sister were trying to get Agolli fired. According to Proko, Agolli then remarked, "I'm young and I can find another job, but what is your sister going to do that she's old and doesn't speak English." (Proko Decl. ¶ 5.) Agolli and Proko continued to argue, and then the plaintiff emerged from one of the bathroom stalls, having heard their conversation.

On March 16, 2012, the plaintiff's doctor determined that the plaintiff's left shoulder strain "had resolved," and that she could return to full duty. (Pl. PFOF ¶ 22.) Around this time—the plaintiff thinks April 5, 2012—a supervisor named Luan required the plaintiff and another employee to scrub grease off of walls in the mechanic's room. (Dhembi Dep. at 45–48.) After the plaintiff performed this task for some time, she asked Luan if he could rotate her out because it was making her shoulder hurt "really bad." (*Id.* at 46.) According the plaintiff, Luan asked what shoulder hurt. When the plaintiff said the left one, Luan told her to scrub using her right shoulder. Agolli, who was nearby, laughed. Luan then rotated the other employee out of the task but required the plaintiff to continue while he, Agolli, and Fons looked on and laughed.

On April 12, 2012, Agolli assigned the plaintiff to a task that involved loading chunks of pork belly into a plastic bucket and carrying them to a chute. As the plaintiff was performing this task, Agolli observed the plaintiff and determined that she was not putting enough meat in the bucket on each trip to the chute. Agolli told a crew leader to

tell the plaintiff to put more meat in the bucket. The crew leader did so, and the plaintiff said that her shoulder hurt. She also complained that she had been doing the task for more than thirty minutes and should have been rotated out by now. Agolli then summoned the plaintiff to her office and asked her why she was not filling the bucket fully on each trip. The plaintiff complained about not being rotated off the task and said that her shoulder hurt and that her knees felt week. Upon hearing this, Agolli sent the plaintiff to the nurse's office. The plaintiff met with the nurse, and afterwards the plaintiff, Fons, and Agolli returned to the plaintiff's work station to see how she had been carrying the meat. While this was occurring, the plant safety inspector came by and determined that the plaintiff should be using a lighter bucket. The plaintiff resumed carrying the meet, this time with the lighter bucket. Eventually, a team leader rotated the plaintiff out of the meat-carrying task. But when Agolli learned of this she screamed and required the plaintiff to continue carrying meat. Sometime later, the safety inspector returned and determined that the plaintiff should only be lifting ten pounds at a time.

The plaintiff contends that carrying the meat caused her pain and that after her shift was over her leg was swollen. She filed an OSHA injury report about the incident and a separate accident report with Patrick Cudahy. In these reports, the plaintiff stated that carrying the meat strained her left shoulder, knees, and left ankle. The day after the meat-carrying incident, the plaintiff stayed home from work and went to see her doctor. The doctor diagnosed her with a shoulder strain, referred her to physical therapy, and restricted her to no work until April 27, 2012. The plaintiff was later cleared to return to work on April 23, 2012. On April 19, 2012, the plaintiff was examined by

Patrick Cudahy's doctor, who determined that the plaintiff should be restricted to seated work for three weeks.

When the plaintiff returned to work on April 23, 2012, Patrick Cudahy's health department wrote a note reflecting the plaintiff's restrictions. When the plaintiff presented the note to Agolli, Agolli assigned her to her regular job duties on the line. However, when the plaintiff reported to the line, she notified the crew leader of her restrictions, and the crew leader assigned her to a seated task that involved labelling boxes. According to the plaintiff, Agolli checked on her constantly while she was labelling boxes and ordered the worker who was making the boxes to make sure that the plaintiff never ran out of boxes to label. The plaintiff became so upset with Agolli's supervision that she went to the nurse and told her that she could no longer take it. She told the nurse that "every night I would not be able to fall asleep and when I would fall asleep I would have nightmares with Ms. Agolli yelling and screaming at me for every thing." (Dhembi Decl. Ex. 2 at p. 6.) The plaintiff states that, after she spoke to the nurse, the tension decreased, but Agolli would still giver her dirty looks.

The plaintiff also contends that, after she injured her shoulder, Agolli would sometimes send her home from work first, before she sent younger workers home. These incidents occurred during the last hour of a shift, when there was not enough work for all employees and the supervisor had discretion to pick someone to send home early. The plaintiff says that she was sent home early "a few times" before younger workers were sent home, but she cannot remember specific dates on which this occurred, other than that one incident occurred in April 2012. (Dhembi Dep. at 92.) The plaintiff also points to another occasion on which she and her sister were performing

light duty work and Agolli sent them home thirty minutes early, after their line had been shut down. (Pl. PFOF ¶ 26.)

The plaintiff continued to work on light duty through May and June of 2012, and during this period the plaintiff gave additional doctor's notes to Patrick Cudahy. Some of these notes contained work restrictions, and others excused her from work for medical treatment.

On June 6, 2012, the plaintiff participated in a union meeting relating to grievances she had filed about Agolli's treatment of her. The plaintiff left this meeting "extremely stressed out" because her supervisors had "denied many things that had happened." (Dhembi Decl. Ex. 2 at p.6.) The plaintiff was so traumatized by what transpired at the meeting that she was admitted to the hospital emergency room with stroke-like systems that her doctors attributed to stress.

On June 28, 2012, the plaintiff was working on the line when Fons and Agolli accused her of improperly wrapping bacon. The plaintiff denied that she was the one who improperly wrapped the bacon. Fons, however, insisted that he witnessed the plaintiff wrap the bacon. Fons gave the plaintiff two notices relating to this incident. One notice, which Patrick Cudahy describes as a "counseling," related to her workmanship in wrapping the bacon. Fons also "counseled" five other employees regarding their workmanship that day. (Def. PFOF ¶ 55.) The second notice was a disciplinary notice for refusing to take responsibility for improperly wrapping the bacon.

On July 2, 2012, Patrick Cudahy granted the plaintiff's request to return to second shift, where she would no longer be supervised by Agolli. Later that month—on July 16, 2012—the plaintiff's doctor lifted all of the plaintiff's work restrictions, and she

was allowed to return to full duty. However, according to the plaintiff, she was not immediately returned to the position she used to perform on second shift, which was "cook controller." (Dhembi Dep. at 137–41.) In December 2012, Patrick Cudahy posted an opening for a cook controller position on second shift. The plaintiff applied for, and was awarded, that position. Since December 21, 2012, the plaintiff has been working in the cook's controller position on second shift. She still works in that position today. However, over the years, the plaintiff has experienced additional health problems that have impacted her ability to work, including an ankle issue that required surgery. But the plaintiff does not allege in this suit that Patrick Cudahy failed to accommodate her ankle injury or honor any work restrictions that were imposed after July 2012. Nor do I understand her to be claiming that Patrick Cudahy subjected her to other forms of disability discrimination or to age discrimination after July 2012.

However, in November 2013, the plaintiff and Agolli had one final run-in. The plaintiff was working on second shift and measuring bacon with a ruler while also controlling the temperature of a microwave using a computer screen. During a shift change, Agolli saw the plaintiff and accused her of touching the computer screen with the ruler. The plaintiff denied using the ruler to touch the screen and told Agolli that she was actually using her finger. The women continued to argue and eventually this incident was referred to human resources. However, no discipline was issued to anyone.

On July 25, 2012, the plaintiff filed a charge with Wisconsin's Equal Rights Division, alleging discrimination based on age and disability. The charge alleged that the discrimination began on March 1, 2012 and continued at least through May 21,

2012.  (ECF No. 18-2 at p. 3 of 4.)   After investigation, the United States Equal Employment Opportunity Commission was unable to conclude that the plaintiff's rights had been violated.  It issued her a right-to-sue letter on December 22, 2015.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

In opposing summary judgment, the plaintiff contends that a reasonable jury could find in her favor on four claims.  First, she contends that it could find that Patrick Cudahy violated the ADA by failing to reasonably accommodate her disability, which she describes as "shoulder problems."[3]  (Pl. Br. in Opp. to Mot. for Summ. J. at 3, ECF No. 27.)  Second, she contends that a reasonable jury could find that Patrick Cudahy subjected her to disparate treatment based on her disability.  Third, she contends that a reasonable jury could find that Patrick Cudahy subjected her to a hostile work environment based on her disability.  Finally, the plaintiff contends that a reasonable jury could find that Patrick Cudahy subjected her to disparate treatment based on her age, in violation of the ADEA.

---

[3] The plaintiff also contends that her "ankle problems" qualify as a disability within the meaning of the ADA.  (Br. in Opp. at 3.)  However, the plaintiff's ADA arguments focus on her shoulder problems, and therefore I will not further discuss her ankle.

## A.    Failure to Accommodate

In order to prevail on a claim for failure to accommodate a disability, the plaintiff must establish that (1) she is a qualified individual with a disability; (2) her employer was aware of this disability; and (3) her employer failed to reasonably accommodate the disability.  *See, e.g., Guzman v. Brown County*, 884 F.3d 633, 642 (7th Cir. 2018).

The plaintiff contends that, at times during the first half of 2012, Patrick Cudahy failed to accommodate her shoulder pain, which she contends is a "disability" within the meaning of the ADA.  She points to the following as instances in which her shoulder pain was not accommodated: (1) on January 23, 2012 the plaintiff returned to work for a full day and Patrick Cudahy did not honor her doctor's restrictions; (2) between February 27 and March 2, 2012, Patrick Cudahy assigned the plaintiff to her regular duties even though it knew that her doctor had restricted her to lifting no more than five pounds and from performing repetitive tasks with her left arm; (3) on April 5, 2012, the plaintiff was made to scrub the mechanic's room walls, which caused her shoulder to hurt; (4) on April 12, 2012, the plaintiff was made to carry buckets of meat, which caused her shoulder to hurt; and (5) when the plaintiff returned to work with restrictions on April 23, 2012, Agolli assigned her to regular duty.   (Objections to Report & Recommendation at 35–40.)

Initially, I note that some of these alleged failure-to-accommodate incidents occurred prior to March 1, 2012, the date on which, according to the plaintiff's EEOC charge, Patrick Cudahy's discrimination began.  The plaintiff's failure to include these earlier incidents in her charge means that she has not exhausted her administrative remedies with respect to them.  *See Basith v. Cook County*, 241 F.3d 919, 931 (7th Cir.

2001).  Therefore, the defendant is entitled to summary judgment on any claims alleging a failure to accommodate that occurred before March 1, 2012.

The first alleged failure-to-accommodate claim that is within the scope of the EEOC charge occurred on March 1 and 2, 2012, when, according to the plaintiff, Patrick Cudahy assigned her to her regular duties even though she was subject to a five-pound lifting restriction and a restriction against repetitive movements with her left arm.  I will assume, for purposes of this claim, that the plaintiff's inability to lift more than five pounds rendered her "disabled" within the meaning of the ADA, as the restriction arguably substantially limited the major life activity of lifting.  *See* 42 U.S.C. § 12102(2)(A).  Further, resolving all factual disputes in the plaintiff's favor, I credit the plaintiff's statement that she presented Patrick Cudahy with her doctor's restriction on February 27.

However, the plaintiff has not presented sufficient evidence to support her allegation that Patrick Cudahy failed to accommodate her work restrictions.  The sole evidence the plaintiff presents on this point is her statement to the Equal Rights Division, in which she states that she was assigned to her regular duties during this time.  (Dhembi Decl. Ex. 2 at 1.)  But the plaintiff does not state that the regular duties that she actually performed during this time exceeded her restrictions.  Indeed, in her proposed statement of facts, the plaintiff extensively describes her work experiences on March 1 and 2 and does not contend that the tasks that she performed on those days exceeded her restrictions.  (Pl. PFOF ¶¶ 13–20.)  (On March 1, the plaintiff was being observed by Patrick Cudahy's doctor to determine if her injury was work-related.  March 2 was the day on which the plaintiff and Agolli argued over the height of her platform. )

Moreover, even assuming that the plaintiff was required to work in excess of her restrictions on March 1 and 2, she does not show that this had any impact on the terms and conditions of her employment, as is required to establish a claim of disability discrimination. *See* 42 U.S.C. § 12112(a). The plaintiff does not allege that performing her regular duties on March 1 or 2 caused her to suffer shoulder pain or that it made her shoulder issue worse. Nor does she allege that she was disciplined for refusing to perform any task that exceeded her restrictions.

The plaintiff does allege that she was sent home early on March 2 because Patrick Cudahy did not have any work for her within her restrictions. (Dhembi Decl. Ex. 2 at p. 1.) The plaintiff seems to contend that Patrick Cudahy should have found work for her to perform in order to accommodate her disability rather than send her home early. However, missing a few hours' work is too slight an injury to be actionable under the ADA. *See Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (finding that employment decisions that have only a "negligible impact" on income are not actionable under the antidiscrimination laws).[4] Thus, the defendant is entitled to summary judgment on the plaintiff's failure-to-accommodate claims based on events that occurred up to March 2, 2012.

The next two failure-to-accommodate claims that are within the scope of the charge involve incidents in which the plaintiff's supervisors made her perform tasks that hurt her shoulder: (1) the wall-scrubbing incident on April 5, and (2) the meat-carrying incident on April 12. Viewing the facts in the light most favorable to the plaintiff, it appears that the plaintiff's supervisors treated her cruelly on these occasions and

---

[4] *Rhodes* was overruled on other grounds in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).

possibly violated workplace-safety standards or the collective-bargaining agreement between Patrick Cudahy and the plaintiff's union. But these incidents did not involve a failure by Patrick Cudahy to reasonably accommodate a disability of which it was aware. On the dates of these incidents, the plaintiff was not subject to any medical restrictions: as of March 19, 2012, the plaintiff's doctor had determined that her shoulder issue "had resolved" and that she could return to full duty. (Pl. PFOF ¶ 22.) Thus, initially assigning the plaintiff to these labor-intensive tasks certainly did not amount to a failure to accommodate a known disability.

The plaintiff seems to contend that when, during these tasks, she complained to her supervisors about shoulder pain and her supervisors forced her to continue, a failure to accommodate occurred. Again, however, while forcing her to continue might have been cruel and a violation of workplace-safety standards or the collective-bargaining agreement, they were not failures to accommodate a known disability. The plaintiff complained about shoulder pain; she did not tell her supervisors or anyone else at Patrick Cudahy that she was disabled and needed an accommodation. *See Guzman*, 884 F.3d at 642 ("Generally, an employer is not obligated to accommodate an employee's disability until the employee informs the employer of the existence of the disability and requests an accommodation."). Shoulder pain is common ailment that few would consider a disability unless it is chronic and substantially limits the ability to function. During the first half of April 2012, the plaintiff was not under a diagnosis of chronic shoulder pain and was not subject to any medical restrictions or known functional limitations. Rather, several weeks before these incidents occurred, the plaintiff's doctor determined that her shoulder issue had resolved and that she could

return to full duty.  Thus, the plaintiff's complaints to her supervisors about shoulder pain during these tasks did not require Patrick Cudahy to immediately provide her with an accommodation.  *See Wells v. Winnebago County, Ill.*, 820 F.3d 864, 867 (7th Cir. 2016) (to set off the process of considering possible accommodations, employee must inform employer of link between her reported symptom and a disability).

The plaintiff's remaining failure-to-accommodate claim involves her allegation that Agolli assigned her to her regular duties on the line on April 23, 2012, even though Patrick Cudahy was aware of new restrictions that the plaintiff's doctors had imposed on April 20, 2012.  But here the plaintiff does not submit evidence showing that she actually performed work that exceeded her restrictions.  The plaintiff testified that after Agolli assigned her to her regular duties on the line, the plaintiff went to the line and informed the crew leader of her restrictions, and that the crew leader then assigned her to light-duty work.  (Dhembi Decl. Ex. 2 at p. 5; Dhembi Dep. at 13.)  Thus, as far as the record reveals, the plaintiff did not actually do work that exceeded her restrictions, and therefore this incident did not involve a failure to accommodate.

For these reasons, Patrick Cudahy is entitled to summary judgment on the plaintiff's failure-to-accommodate claims.

## B.    Other Forms of Disability Discrimination

In addition to alleging that Patrick Cudahy failed to accommodate her disabilities, the plaintiff alleges that it subjected her to disparate treatment because she was disabled.  In his report and recommendation, Magistrate Judge Jones also considered whether the plaintiff could proceed on a hostile-work-environment claim under the ADA.

## 1. Disparate Treatment

In order to defeat summary judgment on her disability-discrimination claim, the plaintiff must point to evidence capable of establishing that (1) she is a person with a disability within the meaning of the ADA; (2) she is qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) she suffered from an adverse employment decision as a result of her disability. *Guzman*, 884 F.3d at 641. Magistrate Judge Jones determined that the plaintiff has not presented sufficient evidence that Patrick Cudahy subjected her to an adverse employment action because of her disability.

In her objection to the report and recommendation, the plaintiff argues that she was subject to two "types" of adverse employment actions because of her disability: (1) the various disciplinary notices she received, and (2) loss of pay. (Objections to Report and Recommendation at 48.) As to the first of these, it is well established that verbal or written disciplinary notices are not adverse employment actions unless they resulted in a "quantitative or qualitative change in the terms or conditions of employment." *Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017). And here, the plaintiff does not identify any change in the terms and conditions of her employment that resulted from the disciplinary notices she received.[5] Nor has she shown that the presence of these disciplinary notices in her employment file could adversely affect her future career

---

[5] In her responses to the defendant's proposed findings stating that the plaintiff's discipline did not affect the terms or conditions of her employment, the plaintiff repeatedly cites her own proposed findings at paragraphs 54 to 56. (*See* Pl's Resp. to Def. PFOF ¶¶ 31, 56, 62.) But these proposed findings simply recount the facts of the discipline that the plaintiff received following the bacon-wrapping incident. They do not suggest that any term or condition of the plaintiff's employment changed because of this discipline.

prospects at the company. Accordingly, the defendant is entitled to summary judgment on the plaintiff's disparate-treatment claim involving the disciplinary notices.

As to the plaintiff's other alleged adverse employment action—loss of pay—it is not clear what pay the plaintiff is referring to. However, I will assume that she is referring to two events: (1) the incident in which she and her sister were on light duty and sent home thirty minutes before other workers; and (2) Patrick Cudahy's failure to immediately assign the plaintiff to the position of cook controller when she returned to second shift.[6]

The plaintiff's evidence concerning the light-duty incident consists entirely of her sister's declaration (*see* Pl. PFOF ¶ 26), in which she states as follows:

> One of the times when Plaintiff was on light duty work, I happened to have a muscular problem and was also on light duty work, so we worked together. The lines that we were working would shut down 30 minutes before others, and Agolli would send us home early; we would leave and not make it a big deal. Agolli would do this on purpose and send us home early and watch us to make sure we punched out early, too. Robert Janku told me this one day in the morning, "you guys are lucky to have punched out when you went home early because had you not done so, you would get in trouble, because Agolli was watching the computer monitor to make sure that you both punched out." I told him that neither I nor Kostandine is desperate for a few dollars that we would cheat minutes from the company.

(Proko Decl. ¶ 6.) This evidence does not give rise to a genuine issue of fact over whether Agolli sent the plaintiff home because she was disabled. It simply shows that the plaintiff and her sister were sent home thirty minutes early, after their lines had shut

---

[6] The plaintiff also references the fact that she asked many times to switch back to second shift before she was finally switched back on July 2, and that Agolli once told her that she would never let her return to second shift. *See* Pl. PFOF ¶ 57. However, shift changes are generally not considered adverse employment actions. *See Koty v. DuPage County, Ill*, __ F.3d __, 2018 WL 3907635, at *3 (7th Cir. 2018). Moreover, the plaintiff does not contend that she was paid less on first shift than she would have been on second shift. Therefore, there is no adverse employment action here.

down, which is entirely unremarkable. There is no evidence that Agolli could have assigned them to other light-duty work for the remaining thirty minutes of their shifts. The fact that Agolli checked to confirm that they actually punched out early is not evidence that she harbored discriminatory intent; it is simply consistent with her reputation of being a stern supervisor. In any event, because this incident deprived the plaintiff of no more than thirty minutes' wages, its effect on her income was too small to qualify as an adverse employment action. *See Rhodes*, 359 F.3d at 505 (actions that have only a negligible impact on income are not materially adverse).

The remaining potential adverse employment action is Patrick Cudahy's not immediately assigning the plaintiff to the position of cook controller, which involves an increase in pay over other positions, when she returned to second shift. However, the plaintiff's evidence on this point consists solely of her deposition testimony, which is extremely unclear. (*See* Pl. PFOF ¶ 62; Dhembi Dep. at 137–41.) It is clear from other evidence that the plaintiff was not officially reassigned to the cook-controller position until December 2012 (Dhembi Decl. Exs. 36 & 39), but it is also clear that the plaintiff worked at that position prior to that date (Dhembi Dep. at 138–39). Thus, it is not clear that the plaintiff ever lost any significant pay due to not being officially assigned to the cook controller position until December. In any event, even if she did lose significant pay, there is no evidence that the failure to formally assign her to the position had anything to do with an alleged disability. In her deposition, the plaintiff seems to blame Agolli for keeping her from the cook-controller position, but no evidence suggests that Agolli, the first-shift supervisor (Pl. PFOF ¶ 4), had any control over who worked at what position on second shift. Moreover, as discussed below, the plaintiff has not shown that

Agolli's harsh treatment of the plaintiff was prompted by the plaintiff's alleged disability. Therefore, a reasonable jury could not conclude from the plaintiff's testimony that Patrick Cudahy's not formally appointing her to the position of cook controller until December 2012 was based on her alleged disabilities.

## 2. Hostile Work Environment

In his report and recommendation, Magistrate Judge Jones addressed whether the plaintiff could succeed on a hostile-work-environment claim under the ADA. However, the Seventh Circuit has not decided whether a hostile-work-environment claim is actionable under the ADA. *See Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009). Moreover, the plaintiff did not allege a hostile-work-environment claim in her complaint, and she did not develop an argument in favor of recognizing such a claim under the ADA in her brief in opposition to the defendant's motion for summary judgment or in her objections to the magistrate's report and recommendation. Because the plaintiff has not developed a legal argument in favor of recognizing a hostile-work-environment claim under the ADA, I decline to address that question. Instead, I conclude that the plaintiff has forfeited any potential hostile-work-environment claim by failing to develop an argument supporting it. *See, e.g., Betco Corp., Ltd. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017) (party waves argument that it fails to develop in the district court).

Although the plaintiff has forfeited any potential hostile-work-environment claim, I also note that she has not shown that the unpleasantness she experienced at work was attributable to her disability. There is no doubt that a reasonable jury could find that Agolli's harsh treatment of the plaintiff rendered her work environment hostile and

abusive to some extent. But unless the plaintiff can show that Agolli treated the plaintiff harshly *because she was disabled*, she could not succeed on a claim for creation of a hostile work environment under the ADA. In other words, there must be some link between the hostile environment and the plaintiff's disability. *See, e.g., Kriescher v. Fox Hills Golf Resort & Conference Ctr.*, 384 F.3d 912, 915 (7th Cir. 2004) (noting that plaintiff alleging hostile work environment must show that unwelcome harassment was based on a protected trait). Here, the plaintiff's evidence would not allow a reasonable jury to find that link. Instead, the evidence reveals that Agolli was simply an abrasive manager who treated everyone harshly. The plaintiff says almost exactly that in her statement to the Equal Rights Division, claiming that "Ms. Agolli is well known for bad manners, yelling and screaming at employees" (Dhembi Decl. Ex. 2 at p. 2), and that the plaintiff is "not the only one that Ms. Agolli disrespects, discriminates, retaliates, and harasses" (*id.* at p. 7).

To the extent that the plaintiff may believe that Agolli singled her out for especially harsh treatment, her evidence would not enable a reasonable jury to conclude that this was because the plaintiff was disabled or was subject to work restrictions. No evidence shows that Agolli was generally biased against employees with disabilities or work restrictions. There is no evidence that, for example, Agolli consistently treated healthy employees more favorably than employees with injuries or disabilities. Moreover, although the plaintiff points to some instances in which Agolli's harsh treatment of her centered around her shoulder problems—such as the incident in which Agolli accused the plaintiff of lying about having injured her shoulder at work— these instances do not give rise to a reasonable inference that Agolli harbored animus

towards the plaintiff because she was injured or disabled, rather than for some other reason or for no reason at all. Moreover, many of the other incidents in which the plaintiff and Agolli clashed had nothing to do with the plaintiff's disability or work restrictions, including the platform-raising incident and the incident in which Agolli accused the plaintiff of touching a computer screen with a ruler. Thus, a jury considering the totality of the evidence could not reasonably infer that Agolli subjected the plaintiff to a hostile work environment because she was disabled.

## C.    Age Discrimination

To survive summary judgment on her claim under the ADEA, the plaintiff must show that a reasonable jury could find that Patrick Cudahy subjected her to an adverse employment action because of her age. *See, e.g., Skiba v. Ill. Central R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018). In her objections to the magistrate's report and recommendation, the plaintiff identifies only one potential adverse employment action that she attributes to age discrimination: Agolli's occasionally sending the plaintiff home early while younger workers were allowed to finish their shifts. (Objections at 52.) According to the plaintiff, this happened "a few times," but she cannot remember specific dates, other than that one incident occurred in April 2012. (Dhembi Dep. at 92.) Each time it occurred, the plaintiff was sent home about one hour earlier than the other workers. (*Id.*) Thus, the plaintiff missed only a few hours' of work due to this alleged act of age discrimination, which is not enough to amount to an adverse employment action. *See Rhodes*, 359 F.3d at 505; *see also Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (explaining that trivial employment actions are not within the scope of the antidiscrimination laws).

The plaintiff also points to the time that Agolli referenced her age and her limited English while having a discussion with her sister in the restroom. (Pl. PFOF ¶ 21.) This comment does not suggest that Agolli was biased against older workers generally or against the plaintiff specifically because of her age. But even if it did, the plaintiff has failed to connect it to any adverse employment action. The plaintiff also notes that in some of her visits to the company nurse, the nurse made comments about how the plaintiff's pain could be related to her age. (Pl. PFOF ¶ 2.) But again, these comments do not suggest that the nurse was biased against older people, and even if they did, the plaintiff has not shown that the nurse participated in any adverse employment action.

Accordingly, the defendant is entitled to summary judgment on the plaintiff's claims of age discrimination.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the magistrate's report and recommendation is **ACCEPTED** and that the defendant's motion for summary judgment is **GRANTED**. The Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 12th day of September, 2018.

s/Lynn Adelman
LYNN ADELMAN
District Judge